IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PETER COSTEA | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CA-H-NO.: |
| | § | |
| THE FRIEDRICH EBERT | § | |
| FOUNDATION | § | |
| Defendant | § | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW PETER COSTEA ("Costea"), Plaintiff, and complains of THE FRIEDRICH EBERT FOUNDATION ("Foundation"), Defendant, as follows:

I.

### JURISDICTION

1. This court has jurisdiction over the Parties and the subject matter of this lawsuit based on diversity jurisdiction, specifically under 28 USC Section 1332. There is complete diversity between the Parties because "all persons on one side of the controversy [are] citizens of different states than all persons on the other side." See, McLaughly v. Miss. Power Co., 376 F.3d 344, 353 (5th Cir. 2004).

2. As it will be detailed below, The Foundation is a citizen of the Federal Republic of Germany "("Germany"). It operates internationally in over 100 countries, and has a permanent office in the United States, located in Washington, DC. The Foundation engages in significant activities in and throughout the United States.

3. Costea, as the Plaintiff, is a citizen of the United States, a resident of the State of Texas, and has his domicile in Harris County, Texas.

4. The amount in controversy exceeds $75,000.00.

II.

## PARTIES

5. The Foundation's main offices are located in Germany, and, specifically, according to its website, in Bonn and Berlin. It runs offices and activities in many parts of the world, on each continent, and in many countries. It also has offices in North America, one in Washington, D.C., in the United States, and one in Ottawa, Canada. [Link: https://www.fes-pscc.org/about/friedrich-ebert-stiftung/]

6. The Foundation's main office in the United States is located at 1023 15th Street, NW, Washington, D.C. 20005. It may be served with the summons and the complaint at that address, by serving Knut Dethlefsen, in his capacity as Representative of the Friedrich Ebert Foundation to the United States and Canada.

7. Costea is an attorney and has been a member of the State Bart of Texas for over thirty (30) years. He is a citizen of the United States and of the State of Texas, with his residence and domicile in Harris County, Texas.

### III.

### VENUE

8. Venue of this action is proper in this judicial district because the parties to this lawsuit reside or transact business in this judicial district; the actions, events, and developments which have given rise to the causes of action sued upon occurred in this judicial district; and the causes of action upon which Plaintiff sues accrued or have an impact in this judicial district.

9. Venue is also proper in this judicial district pursuant to the Texas mandatory venue statute for defamation suits. Chapter 15.017 of the Texas Civil Practice & Remedy Code requires that a suit for damages for defamation must be brought, among others, in the county where the plaintiff resided at the time the cause of action accrued.

### IV.

### NATURE OF LAWSUIT

10. Plaintiff is suing the Defendant for libel defamation.

V.

FACTS

A Little History

11.     On May 5, 1949, close to the fifth anniversary of the end of World War II, several Western nations signed, in London, the Statute of the Council of Europe. Its preamble states, in relevant part, that, "(C)onvinced that the pursuit of peace based upon justice and international cooperation is vital for the preservation of human society and civilization;" and "(R)eafirming their devotion to the spiritual and moral values which are the common heritage of their peoples and the true source of individual freedom, political liberty and the rule of law, principles which form the basis of all genuine democracy …", the signatories engaged to construct, jointly, a new Europe out of the ashes of World War II, and to rebuild the European civilization destroyed by Nazism and German imperialism.

12.     Eventually, the Council of Europe expanded, reaching, within a few years after the end of the Cold War, an immense area of the globe, from Iceland in the North Atlantic to Vladivostok on the Pacific Ocean, and all the way to the Bering Straits. Eventually, a European Court of Human Rights was created, also in 1949, to facilitate the rebuilding of European civilization, democracy, and the rule of law.

13.     The Foundation claims to be a part of this vision which has, since if founding in 1925, evolved into a global vision.

About the Foundation

14.     The Foundation defines itself on its US website in the following manner:

Friedrich-Ebert-Stiftung (FES) – Foundation for social democracy! About us

The Friedrich-Ebert-Stiftung (FES) is the oldest political foundation in Germany with a rich tradition in social democracy dating back to its foundation in 1925. The foundation owes its formation and its mission to the political legacy of its namesake Friedrich Ebert, the first democratically elected German President. The work of our political foundation focuses on the core ideas and values of social democracy – freedom, justice and

Page 4

solidarity. This connects us to social democracy and free trade unions. As a non-profit institution, we organise our work autonomously and independently.

Our goals: We promote (a) a free society, based on the values of solidarity, which offers all its citizens the same opportunities to participate on political, economic, social and cultural levels, regardless of their origin, sex or religion; (b) a lively and strong democracy; sustainable economic growth with decent work for all; (c) a welfare state that provides more education and improved healthcare, but at the same time combats poverty and provides protection against the challenges that life throws at citizens; (d) a country that is responsible for peace and social progress in Europe and in the world.

What we do: We support and strengthen social democracy in particular by means of:

(a) Political educational work to strengthen the civil society. Our political education programs in Germany motivate, enable, inform and qualify citizens to successfully engage in political, trade union and civil spheres. We improve citizens' participation in social discussions and decision-making processes.

(b) Think Tanks: We develop strategies on the core issues of economic, social and educational policies as well as on key issues that advance democracy. At the crossroad where think tanks, academia and political practitioners meet, we create a public discourse for a just and sustainable economic and social order on a national, European and worldwide level.

(c) International cooperation: With our international network of offices in more than 100 countries, we support a policy for peaceful cooperation and human rights, promote the establishment and consolidation of democratic, social and constitutional structures and are pioneers for free trade unions and a strong civil society. We are actively involved in promoting a social, democratic and competitive Europe in the European integration process.

(d) Support for talented young people with scholarship programs, in particular for students and doctoral candidates from low-income families or with a migrant background. This is our contribution to increasing educational democracy.

(e) The collective memory of social democracy: Our archive, library and contemporary history projects keep the historical roots of social democracy and the trade unions alive and provide support for sociopolitical and historical research. (Source: https://www.fes-pscc.org/about/friedrich-ebert-stiftung/) (Exhibit 1)

Thus, the Foundation is a non-media defendant.

Page 5

15. The lofty goals the Foundation identifies on its website, however, are not matched by its actual work and practices. In reality, the Foundation is an ultra-rich establishment which in recent decades has become a crusader for the extreme left. It hires "mercenaries of the word," to borrow a phrase from Mark Twain, to write, smear, and defame by written word individuals, non-governmental organizations, movements, and groups with which the Foundation disagrees.

16. Costea has been a victim of the Foundation's vicious, well planned and well financed global ideological war against individuals and organizations who espouse traditional or conservatives views on the issues of the day.

About Costea

17. Costea was born, during the decade following the signing of the Statute of the Council of Europe, in Romania, in a deeply religious and traditional family. His father was a Baptist preacher, and his mother a deeply religious woman. In 1944 Romania was occupied by the Soviet Union and subsequently was forcefully turned into a communist and totalitarian state.

18. In the prior four (4) years Romania fought Soviet totalitarianism on the Eastern front, and, after August 23, 1944, Nazi Germany on the Western front. Unfortunately, the 1944 Soviet occupation continued even after the end of the war and Soviet troops were still occupying Romania when Costea was born.

19. Because of his Evangelical faith and his father's occupation, Costea suffered discrimination and persecution during the communist regime. The discrimination was rampant, the persecution intense, and it extended to his family as a whole. The decades following the end of WWII were difficult for all Romanians. Life under communism was extremely harsh, citizens were deprived of all political freedom, dissidents, real or presumed, were driven into labor and

Page 6

concentration camps by the tens of thousands, and, within a few decades, communism had caused the death of over 800 000 human beings.

20. Life, however, was doubly harsh for Christians, especially for practicing Christians and, even more harshly, for Evangelicals. Communist and atheist indoctrination by the totalitarian left was extreme. All state institutions, primarily schools and the media, were used to indoctrinate citizens, and particularly the young, in Marxism, extreme left political views, scientific socialism, class hatred, cancel culture. History was being re-written, freedom was called slavery, and slavery was called freedom.

21. And yet, having been raised in a religious atmosphere at home and in church, Costea maintained his religious faith in the face of communist onslaught and totalitarian indoctrination. He was not alone, however. Other Christians did likewise, but they, too, fell victims to totalitarian abuse, discrimination, persecution, and lack of freedom.

22. As the communist reign intensified so did discrimination and persecution. The ultimate incidents which radically impacted Costea's life occurred in the mid 1970s when Costea was denied higher learning for the specific reason that he was a Christian and his father a Baptist preacher. Without any prospects for any freedom or professional or economic fulfillment or future, Costea had to leave Romania in 1978, after the communist authorities stripped him of his Romanian citizenship.

23. Stateless, Costea sought a new home. He was able to eventually make it to the United States as a refugee in the fall of 1978. Through hard work and motivation, as well as the opportunities and generosity offered by the people of the United States, Costea eventually realized the American dream, having attained two terminal degrees, of which a law degree, in

Page 7

1990. In November 1990 Costea was licensed to practice law by the State Bar of Texas, and has continuously practiced law since January 2, 1991, mainly in the area of civil rights and employment discrimination.

Rebuilding Civil Society in South Africa

24. However, even before becoming a licensed lawyer, Costea devoted himself to using his education to promote liberty, civil rights, non-discrimination, and democracy. In 1989 he spent a full academic year in South Africa, teaching international relations at a university in Johannesburg. Driven by a desire to keep the hope for freedom alive in the then isolated South Africa, Costea did his best to inspire students and the public alike, of all colors and races, to strive for freedom.

The Collapse of Communism

25. The end of the same year, December 1989 to be precise, brought freedom to Romania, when communism collapsed as a result of a national revolt. A new era commenced. Not only in Romania, but in the entire Eastern Europe and then the Soviet Union. In the following year and through 1991 communism collapsed in the Soviet Union, the Soviet Union broke up, and communism collapsed, gradually, in all former Soviet Republics.

26. The new era posed major challenges everywhere in the former communist world. The main challenge was to rebuild democracy and the rule of law, design and construct modern democratic institutions and structures, a new education system, a new and free press.

27. The main and ultimate challenge, however, was to rebuild the minds of the hundreds of millions of citizens of former communist regimes, who, for decades had been deprived of political and economic freedom, education, of the opportunity to think freely, of the

Page 8

opportunity to read, write and publish freely, to express themselves freely, to reconnect with their past, traditions, and values. Marxism and communism had uprooted them from their civilizational and cultural past, and had dislodged them from Europe's and the West's democratic tradition.

28.  A particularly great challenge was to teach people who for three generations had not known freedom, the meaning of freedom and the meaning of democracy. To educate the post-communist generation in constitutionalism, civil rights, the concept of elections, the concept of free and fair elections, and the manner in which a genuine democracy works.

Rebuilding Democracy in Romania

29.  Costea did not remain indifferent to these challenges, as have not also many American intellectuals, politicians, constitutional scholars, missionaries, ministers, judges, lawyers, charitable organizations, volunteers, and others who sought to make their contribution to rebuilding the eastern half of Europe. The generations before them had done the same, rebuilding Western Europe after Nazism destroyed it between 1939 and 1945.

30.  Costea tried to do his part, occasionally traveling to Romania to lecture on relevant subjects including civil rights, democracy, the rule of law, and constitutional issues. He lectured in universities, high schools, church venues. All this at his own expense and to the extent he was able to get away from his legal work in the United States.

31.  He also worked with civic groups to enable them to start rebuilding democracy and learn how to fend for themselves through constitutional means to defend and promote their particular interests. Given his conservative, religious, and traditional upbringing and convictions,

Costea worked mostly with pro-life and pro-family groups, advising them on the challenges peculiar to their interests in an increasingly secular age.

32. Thus, in 2006 Costea assisted and advised Christian groups on how to launch the first citizens initiated constitutional referendum in Romania's history. It was the first and most profound, to date, exercise in citizens' participation in the democratic process. It aimed to amend the country's Constitution and define marriage as the union between a man and a woman, in the same manner as the majority of the States of the United States had done during the first decade of the new century, and as other East European countries had also done.

33. Costea also sought to be an example to those aiming to build democracy and the rule of law. He ran for office in 2014 and 2019 as an independent for a seat in the European Parliament.

The Foundation Smears and Libels Costea

34. Apparently, Costea's work had not escaped the attention of the Foundation. In 2020, Costea fell victim to the Foundation's global campaign to smear, demean, defame, and place in a false light individuals, groups, associations and organizations which promote a perspective on civil society which differs from the ideological line promoted by the Foundation.

35. The Foundation's website states that it is active in over 100 countries around the world, and that it runs a think tank to "create a public discourse for a just and sustainable economic and social order on a national, European, and worldwide level."

36. As part of this process, the Foundation employs, through its global network and enormous wealth, academics, intellectuals, writers and other masters of the written word to denigrate conservative persons and groups around the world.

Page 10

37. In June 2020 The Foundation published and distributed around the globe a Booklet in Romanian and English. It was written by a university lecturer in Romania whom the Foundation hired and paid.

The Booklet and Its Falsehoods

38. The Booklet's Romanian title is Conservatorismul Insurgent in Romania, (Exhibit 2) which in English is Insurgent Conservatism in Romania. (Exhibit 3) (Link: http://library.fes.de/pdf-files/bueros/bukarest/16290-20201021.pdf) Costea is identified by name in this Booklet as one of the "actors of insurgent conservatism" in Romania.

39. The Foundation's Booklet has weaved an untruthful narrative about Costea, portraying him before the entire world in a defamatory manner, an extremist who is against democracy, human rights, and the rule of law..

40. Costea's smearing, which will be detailed in greater detail below, starts on the cover page where the Booklet states that the actors allegedly responsible for the resurgence of conservatism in Romania are "responsible for the 'normalization' of extreme right ideas in society."

41. Relevant also, is the following material, also taken from the cover of the Booklet. "Insurgent conservatism, reads the Booklet, is intensifying. New groups and conservative movements in civil society are trying to extend their social base and mobilize adherents, presenting its activism as a rebellion or counter-culture against the dominant political and cultural narrative to modernize society."

42. The Booklet continues: "This study offers a general perspective of the contemporary insurgent conservative ecosystem in Romania, by identifying the groups which

Page 11

belong to it, and by describing the strategies they use to contest - with surprising efficiency, the principles at the foundation of capitalist modernity and democratic liberalism."

43. The last paragraph on the cover page adds that "by reinterpreting and re-defining reality in an illiberal fashion, this new conservative activism is responsible for "normalizing" extreme right ideas in society."

44. The Booklet's Introduction pretends that in the post-communist years there was a growth of "radical, nationalist discourse", including in the ranks of the Orthodox Church. It proposed that "public personalities" emerged during those years which challenged and competed with "progressive groups." Conservative groups, including those who sought to amend the Constitution to provide for the natural family, were called "authoritarian" and "reactionary" and were said to have promoted "an antidemocratic vision of society." They are labeled "intolerant," "authoritarian," and "anti-establishment."

45. The Booklet defines "insurgent conservatism" as "a type of extremist conservatism," a "reaction" to "democratic practices." The pro-family movement is accused of "distorting the mechanisms and values of liberal democracy;" "promoting the systematic violation of the fundamental principles of democracy, such as the rule of law, human rights, and the equality between the sexes."

46. In the pages following the Introduction, the Booklet seeks to place its 2020 conclusions in a historical context. It links the contemporary conservative movement to the "legionary movement" of the 1920s and 1930s which was anti-semitic and highly nationalistic. In fact, the Booklet states that insurgent conservatism is "often neo-legionary, anti-Zionist / anti-semitic, nationalist."

Page 12

47. Following these prefatory remarks, the Booklet launches into a description of the "actors of insurgent conservatism, its structures, strategies, and tactics." The "actors," all of them pro-life and pro-family grass roots movements, are said to have engaged in "reactionary and ultraconservative" actions. Their views are called "ultraconservative, ultra-religious, and reactionary", and are said to be against democracy, human rights, women, minorities, the rule of law.

48. And now, closer to home, the Booklet became more explicit, identifying "the flesh and bones" of this allegedly "ultra-conservative and reactionary" pro-family movement and, more particularly, which individuals and organizations make up its engine. Costea is named as one of them, as are some of the most decent and caring leaders of Romania's Catholic community.

49. Three organizations are primarily denigrated in this manner: (1) the Parents for the Teaching of Religion in Schools Association; (2) Pro-Vita; and (3) the Alliance of Romania's Families. The last organization, AFR, is connected to Costea.

50. The Booklet states the following: "AFR was founded in 2007 by Peter Costea, one of the proponents of the constitutional revision for the definition of marriage in 2006. A lawyer by trade in the United States and a Baptist Christian, he offered legal assistance to the Bodnariu family, in its case against the child protective services of Norway, which temporarily suspended the parents' custody of their children as a result of accusations of violence against their children. Also, together with Pro-Vita he intervened in a legal case in the Constitutional Court in an amicus brief to prevent the recognition in Romania of foreign same-sex marriages.

Page 13

Additionally, in 2019 he ran as an independent in the European Parliament elections, among his political objectives being the protection of the Christian heterosexual marriage, promoting anti-abortion politics, nondiscrimination of Romanian citizens working abroad, reaffirming a national, Christian character and identity."

51. In this context, smeared also is Asociatia Darul Vietii ("Gift of Life Association"), a Catholic pro-life organization which promotes pro-life perspectives and runs pregnancy crisis centers in Romania.

52. The Booklet, however, spares no effort in smearing outstanding public policy institutions in the United States as well, which are credited with assisting the "ultra-conservative" pro-family movements in Romania. Without exception, all of them are depicted in the most derogatory fashion.

53. For instance, the prominent law group, Alliance Defending Freedom (ADF) which almost continuously pleads cases before the United States Supreme Court, is identified as "an extreme right Christian organization which militates for the supremacy of the White race."

54. Liberty Council, which also argues cases in favor of religious freedom and similar causes in the courts of the United States, including the United States Supreme Court, is identified as "an anti-LGBT organization."

55. Likewise smeared is the European Center for Law and Justice, a legal group in Strasbourg, France which is similar to ADF in the United States, but which represents clients in the European Court of Human Rights. The Booklet refers to it as "a Christian advocacy group, anti-LGBT and anti-abortion."

Page 14

56. Summarizing its conclusions, the Booklet predicts that the movements which make up Romania's "insurgent conservatism" will continue to exist as a force exerting "a reactionary pressure .. a genuine challenge to democracy."

57. The Booklet is a product of the Foundation. It contains no disclaimers. The Foundation reserved the right to control the printing, distribution, or reprinting of the Booklet. The Foundation financed the Booklet and assumed responsibility for its content.

Attempts at Amicable Resolution

58. Attacking the reputation of someone, like Costea, who has given more than half of his life to promoting freedom, civil rights, and nondiscrimination in the United States and in Europe, is no laughing matter. The content of the Booklet impugns his character and impairs his reputation.

59. Cognizant of the serious and damaging nature of the defamatory comments made about him in the Booklet, either explicitly or indirectly, Costea sought to reason with the Foundation to reach an amiable, not-monetary, resolution without the filing of a lawsuit. Unfortunately, all such attempts were unsuccessful.

60. The first attempt was on August 24, 2020 by a direct phone conversation, followed by an email. Written communications continued into early September 2020. On September 7, 2020 Costea emailed the Foundation a letter demanding that the Booklet be withdrawn from circulation and be taken down from its website. (Exhibit 4)

61. The Foundation refused to comply, the last communication between the litigants on this subject having occurred on October 26, 2020.

Page 15

62.     The request for the retraction was served on the Foundation within ninety (90) days after Costea became aware of the existence of the booklet and the publication of the defamatory statements.

63.     Moreover, at all times relevant, the statements made in the Booklet were adopted or ratified by the Foundation, and the writer operated in the course and scope of her relationship with the Foundation.

64.     No person associated with the Foundation or the author made any contact with Costea to discuss the allegations or anticipated statements in the Booklet which were made about him or could reasonably be construed, by a reasonable person, to relate to him.

65.     Costea never consented to the defamatory statements. On the contrary, he acted promptly to refute them and to seek their removal immediately after becoming aware of their publication.

VI.

PLAINTIFFS' CLAIM FOR DEFAMATION

66.     Plaintiff realleges all factual allegations made above and would show that Defendant is liable to him for libel defamation. The Foundation has made false and defamatory statements of fact about Costea, as explained above. In so acting, the Foundation has invaded Costea's personal interest in his reputation and good name.

67.     The Foundation's published statements of fact about Costea referred to Costea by name. The statements were defamatory. The statements were false. The Foundation acted with actual malice or reckless disregard for the truth of the statements. Alternatively, the Foundation was negligent, or is liable to Costea without regard to the truth. As a result of the defamatory statements, Costea suffered injury.

Page 16

68. Furthermore, the statements were defamatory per se. They were made with malice, actual malice, or reckless disregard for the truth. The publication of the false statements was made negligently or intentionally. The Foundation made the statements with actual knowledge of their falsity.

69. The defamatory statements in the Booklet are actionable. A reasonable factfinder can reasonably conclude that the statements imply an assertion of fact, and, moreover, that they referred to Costea. The falsity of the statements can also objectively be verified as being such. The statements were not statements of public concern.

70. Additionally, the defamatory statements referred to Costea, both directly and indirectly, and as a readily identifiable person. They tended to and actually injured his reputation and thereby exposed Costea to public hatred, contempt, ridicule, or financial injury, and impeached his honesty, integrity, virtue, and reputation. Moreover, the statements were not ambiguous.

71. Costea furthermore alleges, in the alternative, that there was defamation by implication. The defamatory meaning of the statements are implicit in the statements themselves. In the further alternative, Costea pleads that the Foundation defamed him by gist. The defamatory meaning of the statements arise implicitly from the entirety of the publication's main themes, central ideas, or theses.

72. In the further alternative, Costea additionally alleges that the Foundation defamed him by partial implication. The defamatory meaning of the statements arises implicitly from the publication's discrete parts by inference, suggestion, or deduction.

73. The statements were false. There is nothing substantially true in the statements the Foundation made about Costea either directly or indirectly. The Foundation's entire publication contains statements which the Foundation knew or strongly suspected could present, as a whole, a false and damaging and defamatory impression about Costea.

74. In the alternative, the Foundation knew or should have known that the

Page 17

defamatory statements were false and that the content of the publication would warn a reasonably prudent person of its defamatory potential.

75. Furthermore, the defamatory statements were libelous per se. They are so obviously hurtful to Costea or any person's reputation that their hurtful and defamatory nature may readily be presumed. The statements are libelous per se because they injure a living person's reputation and thus expose the person to public hatred, contempt, or ridicule or financial injury. They impeach a person's honesty, integrity, virtue and reputation. See, Texas Civil Practice & Remedies Code Chapter 73.001.

VII.

DAMAGES

76. As a direct result of the Foundation's false and defamatory statements Costea has endured shame, embarrassment, humiliation, and mental pain and anguish. Costea is currently injured and will in the future be seriously injured in his good name and reputation in the community.

Libel Per Se Damages

77. The Foundation's defamatory statements against and about Costea are libelous on their face and as such actionable pursuant to Section 73.01 of the Civil Practice and Remedies Code. Costea, therefore, claims general damages in excess of the minimum jurisdictional limits of this court.

Special Damages

78. As a further proximate result of the defamatory remarks published and disseminated about Costea by the Foundation, Costea has suffered special damages. His professional reputation has been seriously affected. Costea's credibility, professionalism, and vocation have been seriously injured by the Foundation's untruthful statements about him. It will take Costea years to reestablish his credibility and good name in the community. Additionally, it is reasonable and foreseeable that the Foundation's libelous remarks about Costea will injure him

Page 18

in the future in the pursuit of his career.

79. All these injuries exceed the minimum jurisdictional limits of this court.

General and Compensatory Damages

80. Furthermore, Costea seeks general and noneconomic damages as provided by law, including, but not limited to, injury to character and reputation, personal humiliation, injury to feelings, mental anguish and similar wrongs. Costea also seeks to recover from the Foundation reputation damages and damages to his character. Costea further is entitled to nominal damages.

Exemplary Damages

81. Considering the Foundation's unwillingness, in spite of more than one request, to retract, correct, or withdraw from circulation the defamatory publication, the Foundation has shown reckless disregard and malice and, accordingly, Costea is entitled to and seeks exemplary damages.

82. The Foundation's libelous statements about and against Costea were made maliciously, recklessly, and with an entire want of care. Therefore, Costea requests the court to allow exemplary damages on this count.

83. The Foundation has impugned Costea's character and good name and reputation and has tarnished his lifelong commitment and consistent track record in promoting human rights, faith on the part of citizens in democracy, courts, the rule of law, and in the constitutional order. It has done so by attributing to him false factual notions such as that he embraces, shares, and imparts antidemocratic views, extremist views, and "extreme right views."

84. These statements about Costea were false when made, with an awareness that they were false, were made recklessly, and with reckless disregard for whether or not they were false. Unfortunately, the Booklet's false and reckless portraying of Costea could cause a reasonable reader to believe that the challenged statements were conveying facts about Costea.

85. Furthermore, the Foundation set out a preconceived narrative about Costea, motivated by ill will and bias. It and the writer failed to contact Costea to ascertain the

truthfulness of the statements. It and the writer had obvious reasons to doubt the statements, creating a false and facially implausible and factually flimsy narrative.

## VIII.

## DAMAGES AND HARM

86. Costea is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the Foundation's unlawful practices unless and until this court grants relief.

87. Costea further alleges that the Foundation's conduct was grossly negligent and, as such, moves the court for an award of exemplary damages.

## IX.

## JURY DEMAND

88. Plaintiff respectfully demands a trial by jury.

## X.

## PRAYER FOR RELIEF

89. WHEREFORE, PREMISES CONSIDERED, Plaintiff Peter Costea respectfully prays that Defendant Friedrich Ebert Foundation be cited to appear and answer and that on final trial Plaintiff be granted relief as follows:

1. Judgment in excess of the minimum jurisdictional limits of this court;

2. Judgment enjoining and permanently restraining the violations of the law by the Defendant;

3. Judgment directing Defendant to pay Plaintiff actual, compensatory, liquidated, and punitive damages on all counts, whether statutory or common law, and as more fully set out above;

4. Retraction, public apology, cessation of the circulation of the Booklet and similar actions and measures reasonably designed to correct all damages to Costea's reputation and to prevent such damages from reoccurring in the future;

  5.  Costs of suit and reasonable attorney's fees;

  6.  Prejudgment and postjudgment interest as provided by law; and

  7.  Such other and further relief, in law and in equity, to which Plaintiffs may be justly entitled.

    Respectfully submitted,

    BY: //ss// *peter costea*
    _____
    Peter Costea
    TBN 04855900
    4544 Post Oak Place, Suite 350
    Houston, Texas 77027
    Tel. 713-337-4304
    Fax 713-237-0401
    Email: peter@costealaw.com
    PLAINTIFF PRO SE