IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **PETER COSTEA** <br> *Plaintiff* <br><br> VS. <br><br> **THE FRIEDRICH EBERT FOUNDATION** <br> *Defendant* | § <br> § <br> § <br> § <br> § <br> § <br> § | <br><br><br> CIVIL ACTION NO. 21-cv-01078 |

**DEFENDANT'S FIRST AMENDED MOTION TO DISMISS PURSUANT TO RULE 12(B)(2) AND *FORUM NON CONVENIENS***

Defendant, the Friedrich Ebert Foundation (the "Foundation"), asks the Court to dismiss the claims of Plaintiff, Peter Costea ("Costea"), pursuant to Fed. R. Civ. P. 12(b)(2) and *forum non conveniens*.

## I.  INTRODUCTION

1.     Costea sued the Foundation for various claims of defamation arising out of the Foundation's internet publication of a June 2020 written study titled, "Insurgent Conservatism in Romania" (the "Study"). The Foundation is a non-profit political organization headquartered in Germany. Costea is an attorney and former Romanian European Parliament political candidate residing in Harris County, Texas. In a single paragraph, the Study describes Costea's involvement in Romanian, Norwegian, and European political and social movements.

2.     This Court does not have personal jurisdiction over the Foundation. The Foundation does not have continuous and systematic contact with Texas because the Foundation maintains only one office in the United States, which is located in Washington, D.C. Consequently, this Court does not possess general jurisdiction over the Foundation. Likewise, this Court does not possess specific jurisdiction either: the Foundation did not purposefully direct

any activities at Texas that resulted in the injuries alleged by Plaintiff. Thus, this Court should dismiss all claims against the Foundation pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

3.  Dismissal under the doctrine of *forum non conveniens* is also appropriate because deference should not be accorded to Costea's choice of forum, Romania is an adequate and available alternative forum, and public and private interest factors weigh in favor of dismissal.

## II. FACTUAL BACKGROUND

A.  THE PARTIES, THE STUDY, AND THE PLAINTIFF'S CLAIMS AND COMPLAINT

4.  Established in 1925, the Foundation is Germany's oldest political foundation. Cmplt. ¶ 14. The Foundation's goal is to promote certain political, social, and economic policies and values in Germany, Europe, and throughout the world. Cmplt. ¶ 14. The Foundation accomplishes these goals through (1) political educational programs implemented in Germany; (2) think tanks that develop economic, social, and educational policies; (3) international promotion of the Foundation's values and policies, including by participation in the European integration process; (4) scholarship programs; and (5) maintaining an archival library for sociopolitical and historical research. Cmplt. ¶ 14. Though headquartered in Germany, the Foundation maintains offices in more than one hundred countries throughout world, including one office in the United States, which is located in Washington, D.C. Cmplt. ¶¶ 5, 6, & 14.

5.  Costea is an activist, lawyer and politician, who immigrated to the United States in 1978. Cmplt. ¶ 23. Costea resides and practices law in Harris County, Texas, but frequently engages in political and social advocacy and education in countries throughout the world. Cmplt. ¶¶ 24, 29–32. Seeking to be "an example to those aiming to build democracy and the rule of

law," Costea ran for office in 2014 and 2019 for a Romanian seat in the European Parliament. Cmplt. ¶ 33.

6. Romanian professor, Diana Mărgărit, authored the Study in June 2020. Cmplt. ¶ 37. The Foundation made the Study available in English and Romanian on the Foundation's website. Cmplt. ¶¶ 37 & 38. Ms. Mărgărit states in the Introduction to the Study, "This study seeks to foster an understanding of insurgent Romanian conservatism, its origins, its ideological resources, the strategies and tactics it employs, as well as the types of discourse that are specific to it." Cmplt. at Ex. 3, pg. 5. The thirteen-page Study includes only one paragraph that refers to Costea, which states as follows:

> The [Alliance of Romanian Families] was founded in 2007 by Peter Costea, one of the initiators of the proposal for a constitutional revision of the definition of marriage forwarded in 2006. A lawyer by profession from the United States and a Baptist Christian, he provided legal assistance to the Bodnariu family in the action taken against Child Protection Services in Norway. In the case, Norwegian Child Protection Services temporarily removed custody of parents who were accused of having used physical violence against their children. In addition, Costea, acting together with Pro-Vita, spearheaded a campaign for registration of an amicus curiae at the Constitutional Court aimed at rejecting the recognition of same-sex marriage in Romania. In addition, he stood as an independent candidate in parliamentary elections in 2019, with his political objectives including protection of the heterosexual Christian family, anti-abortion policies, non-discrimination of Romanian citizens abroad, and reaffirmation of the Christian elements of national identity (Costea-parlamentuleuropean.ro 2019).

Cmplt. at Ex. 3, pgs. 12–13. The Study does not mention Texas or any of Costea's activities in Texas. Cmplt. at Ex. 3.

7. Costea sued the Foundation for various claims of defamation stemming directly from the statements in the Study referring to Costea. Cmplt. ¶¶ 66–75. Section I of the Complaint (Jurisdiction) states that the Foundation is a citizen of Germany, has an office in Washington, D.C., and engages in activities in and throughout the United States, but provides no additional basis for this Court's exercise of personal jurisdiction over the Foundation. Cmplt. ¶ 2.

B.     FACTS RELATING TO PERSONAL JURISDICTION

8.     The Foundation is headquartered in Germany, and as explained in the Declaration of Knut Dethlefsen, the Executive Director of the Foundation's Washington, D.C. office, the Foundation has practically no contact with Texas:

- The Foundation does not have any offices in Texas.

- The Foundation has only participated in two events in Texas during the past five years. Members of the Foundation participated in a round table event at the University of Texas in Austin during a festival in 2019. Additionally, Foundation members also participated in meetings in Texas during a 2016 global exchange program.

- The Foundation does not have any members that are registered in Texas.

- The Foundation has not had any educational scholarship stipends or grants targeted towards Texas citizens.

- The Foundation was unaware that Costea was a Texas resident prior to posting the Study on the Foundation's website.

- The Foundation did not intend to have any impact on any Texas residents by posting the Study on its website.

- The Foundation did not intend to target a Texas audience through the posting of the Study on the Foundation's website.

*See* Declaration of Knut Dethlefsen, attached as Exhibit A. *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir. 1982) (court may consider defendant's affidavits when ruling on motion to dismiss for lack of personal jurisdiction).

9.     The Study's author, Romanian professor, Diana Mărgărit, further testified to the following relevant facts in her Declaration:

- The Study was intended to inform academics interested in European politics of Ms. Mărgărit's opinions regarding conservative political movements in Romania.

- The Study was not targeted at a Texas audience.

- The Study was not intended to have any impact on any Texas residents.

*See* Declaration of Diana Mărgărit, attached as Exhibit B.

### III.  DISMISSAL PURSUANT TO RULE 12(B)(2)

A.  **THE COURT MUST DISMISS PLAINTIFF'S CLAIMS AGAINST THE FOUNDATION BECAUSE THE COURT HAS NO GENERAL OR SPECIFIC JURISDICTION OVER THE FOUNDATION.**

10. A court may exercise personal jurisdiction over a nonresident defendant only if permitted by the applicable law of the forum state. *See* Fed. R. Civ. P. 4(e), (h), (k). Under Texas' long-arm statute, a court has personal jurisdiction over a foreign defendant "to the fullest extent allowed by the federal constitution." *Central Freight Lines, Inc. v. APA Trans. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003); *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).

11. The Due Process Clause allows a court to exercise personal jurisdiction over a nonresident defendant only when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Central Freight Lines*, 322 F.3d at 380 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). "Minimum contacts" requires a showing of either general or specific jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). A court has specific jurisdiction over a nonresident defendant if the defendant "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id*. A court has general jurisdiction when a

nonresident defendant's contacts with the forum state, although unrelated to the plaintiffs claims, are "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). The plaintiff bears the burden of establishing minimum contacts. *Central Freight Lines*, 322 F.3d at 384.

12. Neither specific nor general jurisdiction exists here. The Study does not refer to any activities that took place in Texas. Cmplt. at Ex. 3. Moreover, based on its lack of contact with Texas, the Foundation could not reasonably have foreseen being haled into court for the claims relating to the Study. *See Alpine View Co.*, 205 F.3d at 215 ("[F]oreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.").

    **i.    This Court lacks general jurisdiction over the Foundation because the Foundation does not have the substantial, continuous and systematic contacts with Texas necessary to establish general jurisdiction.**

13. The Foundation's contacts with Texas do not meet the threshold requirement for the Court to assert general jurisdiction. A court may assert general jurisdiction over a nonresident defendant only if the defendant has had "continuous and systematic contacts" with the forum state. *Helicopteros*, 366 U.S. at 415–16. The standard for establishing general jurisdiction is high, *see Wilson v. Humphreys Ltd.*, 916 F.2d 1239, 1243 (7th Cir. 1990); *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986), and cases where the Fifth Circuit "has found general jurisdiction over a foreign defendant" are "rare." *Patterson v. Aker Sols. Inc.*, 826 F.3d 231, 236 (5th Cir. 2016).

14. The Foundation's contacts with Texas do not create such a "rare case." Indeed, in his Complaint, Costea has not alleged that the Foundation has any individual personal contacts with Texas. As explained in Knut Dethlefsen's Declaration,

- The Foundation does not have any offices in Texas.

- The Foundation has only participated in two events in Texas during the past five years. Members of the Foundation participated in a round table event at the University of Texas in Austin during a festival in 2019. Additionally, Foundation members also participated in meetings in Texas during a 2016 global exchange program.

- The Foundation does not have any members that are registered in Texas.

- The Foundation has not had any educational scholarship stipends or grants targeted towards Texas citizens.

*See* Declaration of Knut Dethlefsen, attached as Exhibit A.

15. In *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2002), a case similar to this one, the Fifth Circuit affirmed the dismissal of a libel claim brought by a Texas resident against a non-resident online publisher and author after finding that general jurisdiction over the publisher was lacking. In *Revell*, a New York-based university website owner was held not to have a sufficient presence in Texas to warrant the exercise of general jurisdiction. *Id*. at 471. The plaintiff, a Texas resident, sued for libel after a professor alleged in a post on a Columbia University website that the plaintiff had prior knowledge regarding the 1988 bombing of Pan Am Flight 103 over Scotland. *Id*. at 469. The Fifth Circuit characterized the "question of general jurisdiction" as "not difficult." *Id*. at 471. Although "the maintenance of a website is, in a sense, a continuous presence everywhere in the world, the cited contacts of Columbia University with Texas were not in any way 'substantial.'" *Id*. Columbia University had never received more than twenty internet subscriptions to the Columbia Journalism Review from Texas residents. *Id*.

16. Likewise, the Foundation does not have any offices or members registered in Texas. *See* Exhibit A. The Foundation has only participated in two events in Texas during the

past five years. *Id*. Additionally, the Foundation has not had any educational scholarship stipends or grants targeted towards Texas citizens. *Id*. Because it does not have "continuous and systematic" contacts with Texas, there is no basis for asserting general jurisdiction over the Foundation.

> ii. **This Court lacks specific jurisdiction over the Foundation because Texas was not the focal point of the Study and because the Foundation did not aim any conduct at Texas.**

17. To establish specific jurisdiction over the Foundation, Costea must establish that Texas was the focal point of both the challenged Study and the alleged harm suffered. *See Calder v. Jones*, 465 U.S. 783, 789 (1984). Costea cannot establish that in this case.

18. The seminal authority on specific jurisdiction in cases such as this is *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, a California actress brought suit there against two Floridians who wrote and edited in Florida a National Enquirer article claiming that the actress had an alcohol problem. *Id*. at 788. The Supreme Court held that California had jurisdiction because "California [was] the focal point both of the story and the harm suffered." *Id*. at 789. The writers' "actions were expressly aimed at California," and "they knew that the brunt of . . . injury would be felt by [the actress] in the State in which she lives and works." *Id*. at 789–90. Thus, the Court concluded, "Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California." *Id*. at 789.

19. The Study is titled, "Insurgent Conservatism in Romania," and it focuses on Romanian political, economic, and social issues. Cmplt. at Ex. 3. Costea is mentioned in a single paragraph describing Costea's political and social involvement in Romania, Norway, and European Parliament elections. Cmplt. at Ex. 3, pgs. 11–12. Texas is not mentioned anywhere in the Study. Cmplt. at Ex. 3. There is simply no basis to maintain that the Study was targeted at a

Texas audience or that the Foundation, a German-based organization, could reasonably foresee any injury being felt by a minor subject of the Study in Texas.

20. The Study was intended to inform academics interested in European politics of the author's opinions regarding conservative political movements in Romania. *See* Exhibit B. The Study was not targeted at a Texas audience. *Id*. The Study was not intended to have any impact on any Texas residents. *Id*. The Foundation did not know that Costea was a Texas resident prior to posting the Study on its website. *See* Exhibit A. The Foundation did not intend to have any impact on any Texas residents by posting the Study on its website. *Id*. The Foundation did not intend to target a Texas audience through the posting of the Study on the Foundation's website. *Id*.

21. The Fifth Circuit has made clear that "*Calder*'s 'effects' test is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). "[T]he plaintiff's residence in forum, and suffering of harm there, will not alone support jurisdiction under *Calder*." *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002). Instead, *Calder*'s "effects test" requires a demonstration that both "(1) the subject matter of and (2) the sources relied upon for the article were in the forum state." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 426 (5th Cir. 2005) (citing *Revell*, 317 F.3d at 474 & n. 48). A mere collateral reference to the forum state is insufficient to establish specific jurisdiction under *Calder*. *See id*. at 426.

22. Though Costea is a Texas resident, he is not the subject matter of the Study. Cmplt. at Ex. 3. The Study focuses on Romanian politics. Cmplt. at Ex. 3. Only Costea's involvement in European politics is mentioned in the Study. Cmplt. at Ex. 3, pgs. 11–12.

Nothing regarding Costea's residence or activities in Texas is included in the Study. Cmplt. at Ex. 3. The source from which information regarding Costea was obtained for the Study is Costea's own European-based website promoting Costea's candidacy for European parliament. Cmplt. at Ex. 3, pg. 12.

23. Because the Foundation did not aim any conduct at Texas relating to Costea's claims and because the focal point of the challenged Study was not Texas, the Court lacks specific jurisdiction over the Foundation.

B. **THE EXERCISE OF JURISDICTION OVER THE FOUNDATION WOULD OFFEND TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE.**

24. Even if this Court had general or specific jurisdiction over the Foundation, the Court should still dismiss the Foundation because the assertion of jurisdiction would violate traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 115 (1987). Forcing the Foundation, a German nonprofit organization with no contacts with Texas, to defend this lawsuit in Texas would impose an unjustified and unconstitutional burden on the Foundation. This is especially true given that the Foundation did not aim any conduct at Texas relating to the challenged Study and given that Texas was not in any way the focal point or target of the challenged Study. To assert jurisdiction over the Foundation therefore violates traditional notions of fair play and substantial justice.

### V. DISMISSAL FOR *FORUM NON CONVENIENS*

25. The Court should also dismiss Costea's Complaint because Texas is not an appropriate forum for litigation of Costea's claims. "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28

U.S.C.A. § 1406. Under the doctrine of *forum non conveniens*, the Court may decline to exercise jurisdiction "if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir.2001). "[T]he ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

26. Analysis of a motion to dismiss for *forum non conveniens* proceeds in three stages. First, the Court "determines the degree of deference properly accorded the plaintiff's choice of forum." *Norex Petro. Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir.2005). Second, it decides whether an available and adequate alternative forum exists. *Id*. Third, it determines which forum is best suited to the litigation. *Id*.

A. **COSTEA'S CHOICE OF FORUM SHOULD NOT BE ACCORDED DEFERENCE.**

27. "When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56, 102 S. Ct. 252, 266, 70 L. Ed. 2d 419 (1981). "The degree to which courts defer to the plaintiff's chosen venue is substantially reduced where the plaintiff's venue choice is not its residence or where the forum lacks a significant connection to the activities alleged in the complaint.'" *Fabus Corp. v. Asiana Exp. Corp.*, No. C-00-3172 PJH, 2001 WL 253185, at *1 (N.D. Cal. Mar. 5, 2001). Courts give less deference to a plaintiff's choice of forum when the plaintiff engages in international business and has operations and

offices in the alternative forum. *Innovation First Int'l, Inc. v. Zuru, Inc.*, 513 Fed. Appx. 386, 392 (5th Cir. 2013).

28. Costea was born in Romania where he resided for more than twenty years before immigrating to the United States. Cmplt. ¶¶ 17 & 23. After moving to the United States, Costea occasionally traveled to Romania to lecture, work with civic groups, and ultimately run for political office. Cmplt. ¶¶ 31–33. Costea is a Romanian citizen and remains politically active in Romania. Cmplt. ¶¶ 31–33. The Study concerns Romanian politics and the single paragraph discussing Costea refers to Costea's involvement in Romanian and European political and social movements. Cmplt. at Ex. 3, pgs. 11–12. The Study makes no mention of Houston or Texas. Costea devotes several pages of his Complaint to describing the history of and his involvement in Romanian political and social movements. Cmplt. ¶¶ 17–33. Costea's choice of forum should be afforded little deference in light of the significant connection to Romania of Costea and the Study.

B. **ROMANIA IS AN ADEQUATE AND AVAILABLE ALTERNATIVE FORUM.**

29. An alternative forum is available if "the entire case and all parties can come within the jurisdiction of that forum." *In Re Air Crash Disaster near New Orleans*, 821 F.2d 1147, 1165 (5th Cir. 1987). An alternative forum is adequate if the parties will be treated fairly and not deprived of all remedies, even if they may not enjoy the same benefits as they might receive in an American court. *Id*. The plaintiff has the burden to overcome the presumption that the alternative forum is adequate. *Simcox v. McDermott Int'l, Inc.*, 152 F.R.D. 689, 694-95 (S.D. Tex. 1994).

30. Courts do not consider substantive differences in the alternative forum's law unless "the remedy provided by the alternative forum is so clearly inadequate . . . that it is no

remedy at all." *Piper Aircraft*, 454 U.S. at 254. In *Piper Aircraft*, for example, the court held that Scotland was an adequate alternative forum even though the plaintiffs would recover fewer damages because Scottish law did not recognize strict liability in tort. *Id*., at 254-55; *see also Urena Taylor v. Daimler Chrysler Corp.*, 196 F. Supp. 2d 428, 432–33 (E.D. Tex. 2001) (holding that Mexico was an adequate alternative forum even though plaintiffs would recover less in damages).

31. Other courts have recognized that Romania is an adequate and available forum for litigation. "The Republic of Romania is a democratic state and a member of the European Union. Its legal tradition stems from a civil law system. Romanian law provides a remedy to those who timely make their claims." *Costinel v. Tidewater, Inc.*, No. CIV.A. 10-1567, 2011 WL 446297, at *5 (E.D. La. Feb. 3, 2011). "Germany and Romania are adequate fora." *Banculescu v. Compania Sud Americana De Vapores, SA*, No. 11 CIV. 2681 ALC, 2012 WL 5909696, at *7 (S.D.N.Y. Nov. 26, 2012) (citing *Calavo Growers of Cal. v. Generali Belgium*, 632 F.2d 963, 968 (2d Cir. 1980)) (finding that courts are available in both Germany and Romania to hear plaintiff's personal injury claims). Therefore, Romania is an available and adequate forum in which Costea could obtain the relief to which he seeks in this litigation.

C. **PRIVATE AND PUBLIC INTEREST FACTORS WEIGH IN FAVOR OF DISMISSAL.**

32. The final prong of the analysis begins with a consideration of "relevant factors of private interest." *In re Air Crash Disaster Near New Orleans, La., on July 9, 1982*, 821 F.2d 1147, 1165 (5th Cir.1987) (en banc), *vacated on other grounds sub nom*. *Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989).

33. If the private interest factors weigh in favor of dismissal, the motion to dismiss for *forum non conveniens* may be granted. *See Empresa Lineas Maritimas Argentinas, S.A. v.*

*Schichau–Unterweser, A.G.*, 955 F.2d 368, 376 (5th Cir. 1992) (finding "no need to consider the public interest factors" when the "balance of private interest factors favor[ed] dismissal"). Otherwise, the Court must consider in turn the relevant public interest factors. "If these factors weigh in the moving party's favor, the district court may dismiss the case." *Gonzalez v. Chrysler Corp.*, 301 F.3d 377, 380 (5th Cir. 2002) (citing *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 837 (5th Cir. 1993)); *see also In re Air Crash*, 821 F.2d at 1165 ("If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors.").

      i.      **Private interest factors**

34.    "The private interest factors to be considered by the Court relate primarily to the convenience of the litigants." *Glenn v. BP p.l.c.*, 27 F. Supp. 3d 755, 759 (S.D. Tex. 2014), *aff'd*, 602 F. App'x 199 (5th Cir. 2015). The following are the private interest factors the Court considers:

> (1) relative ease of access to sources of proof;
> (2) availability of compulsory process to secure the attendance of unwilling witnesses;
> (3) cost of attendance for willing witnesses; and
> (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

35.    The Study concerns Romanian politics and its author and sources are located in Romania and Europe. Cmplt. at Ex. 3, pgs. 17–20. The witnesses necessary to determine the veracity of Costea's claims and the defamatory nature, if any, of the statements in the Study made about Costea are all located in Europe. Costea's factual theory of this case, as outlined in Section V of his Complaint, relies on a detailed history of Romanian government affairs over the past century and Costea's involvement in Romanian political movements. Cmplt. ¶¶ 11–33. The

sources of proof for such information would necessarily be located in Romania and Europe. Forcing Romanian and European witnesses to appear in Texas would be burdensome and expensive. *BBC Chartering & Logistic GmbH & Co. K.G. v. Siemens Wind Power A/S*, 546 F. Supp. 2d 437, 448 (S.D. Tex. 2008) (finding the difficulties of obtaining documents and witnesses from Denmark and Germany weighed in favor of dismissal).

36. Because the sources of proof and witnesses necessary to establish Costea's claims are located in Romania and throughout Europe, the cost of attendance for witnesses would be far less if this case was tried in Romania rather than in Europe. The cost to Costea of trying the case in Romania is clearly not burdensome since Costea frequently travels to Europe and Romania, including in his multiple runs for political office during the past seven years. Cmplt. ¶¶ 24, 29–33.

37. Costea's lawsuit relies on a complex history of Romanian political and social movements dating back to World War II, and Costea's involvement in such movements. Cmplt. ¶¶ 11–33. A court in Romania would likely be more familiar with the history of Romania, and attempting to educate a Southern District of Texas jury about the unfamiliar historical context for Costea's claims would be inefficient and costly.

38. Due to the Study's and Costea's lawsuit's significant relation to Romania, and contrasting minor relation to Texas, the private interest factors weigh heavily in favor of dismissal.

   **ii. Public interest factors**

39. In cases where the private interest factors do not weigh heavily in favor of the alternative forum, a court may still dismiss an action in light of the relevant public interest considerations. *See In re Air Crash*, 821 F.2d at 1165–66 ("[E]ven when the private

conveniences of the litigants are nearly in balance, a trial court has discretion to grant forum non conveniens dismissal upon finding that retention of jurisdiction would be unduly burdensome to the community, that there is little or no public interest in the dispute or that foreign law will predominate if jurisdiction is retained.") (quoting *Pain v. United Technologies Corp.*, 637 F.2d 775, 792 (D.C.Cir. 1980)). The following are the five public interest factors:

> (1) administrative difficulties flowing from court congestion;
> (2) local interest in having localized controversies decided at home;
> (3) familiarity of the forum with the law that will govern the case;
> (4) avoidance of unnecessary problems of conflict of laws or the application of foreign law; and
> (5) unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. 252.

40. Romania has a superior interest in resolving Costea's complaints. A Romanian author wrote the Study about Romanian politics. Cmplt. at Ex. 3, pgs. 20. Costea's minor role in the Study relates to his role in Romanian political affairs. Cmplt. at Ex. 3, pgs. 11–12. The Study simply has no relation to Houston, Harris County, or Texas. For this reason, citizens of Texas should also not be burdened by adjudicating a dispute with no relevance to Texas. *See, e.g., Vinmar Trade Fin., Ltd. v. Util. Trailers de Mex., S.A. de. C.V.*, 336 S.W.3d 664, 679 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (Texas jurors have no interest in controversy involving contracts executed in Mexico, torts originating in Mexico and dispute involving an international corporation "purposefully seeking to conduct business in foreign markets").

41. Since the Study relates solely to European and Romanian politics, the public interest factors weigh in favor of dismissal from a Texas court.

## VI.  CONCLUSION AND PRAYER

Defendant the Friedrich Ebert Foundation respectfully requests that this Court (a) grant this First Amended Motion to Dismiss, (b) dismiss this action, and (c) grant such other and further relief to which Defendant is justly entitled at law or in equity.

Respectfully submitted,

**ROTHFELDER & FALICK, L.L.P.**

*/s/ Michael C. Falick*
Michael C. Falick
Texas Bar No. 06794600
Federal Bar No. 13672
mfalick@rothfelderfalick.com
Christopher W. Rothfelder
State Bar No. 24084740
Federal Bar No. 2449594
crothfelder@rothfelderfalick.com
1201 Louisiana, Suite 550
Houston, TX 77002
Telephone:  (713) 220-2288
Facsimile:  (713) 658-8211
**ATTORNEYS FOR DEFENDANT,**
**THE FRIEDRICH EBERT FOUNDATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of this document was automatically served on the following via electronic delivery on June 14, 2021:

Peter Costea
4544 Post Oak Place, Suite 350
Houston, Texas 77027
peter@costealaw.com

*/s/ Michael C. Falick*
Michael C. Falick